UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

NILOUFER ANNA MARIA BRAGANZA,

    Plaintiff,

- against -

EXECUTIVE SHIP MANAGEMENT PTE. LTD.; BP p.l.c.; BP SHIPPING LIMITED; BP MARITIME SERVICES (SINGAPORE) PTE. LIMITED; BP MARITIME SERVICES (ISLE OF MAN) LTD.; BP MARITIME SERVICES LTD.; BP SHIPPING; and PIPTON, LTD.,

    Defendants.

---

CV-10- 2115

Civil Action No. -

COMPLAINT

IRIZARRY, J.
GO M.J.



    Plaintiff, NILOUFER ANNA MARIA BRAGANZA, by and through her attorneys, DeOrchis & Partners, LLP, as and for a Complaint against defendants, EXECUTIVE SHIP MANAGAMENT PTE LTD.; BP p.l.c.; BP SHIPPING LIMITED; BP MARITIME SERVICES (SINGAPORE) PTE. LIMITED; BP MARITIME SERVICES (ISLE OF MAN) LTD.; BP MARITIME SERVICES, LTD.; BP SHIPPING; and PIPTON, LTD. alleges upon information and belief as follows:

    1.    Nothing herein is intended to waive, abrogate, influence, prejudice and/or otherwise compromise any claim(s) arising from the herein matter that will be asserted in the future, including but not limited to, claims Plaintiff Niloufer Anna Maria Braganza asserts individually and/or that she will make as a personal representative of the Estate of Renford Agnello Eustace Braganza, and/or that a personal representative and/or administrator/administratrix will make on behalf of Niloufer Anna Maria Braganza and/or the Estate of Renford Agnello Eustace Braganza.

1

## JURISDICTION AND VENUE

2. This Court has jurisdiction under 28 U.S.C. § 1333, because the cause of action asserted herein is an admiralty and/or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and concerns the parties' dispute over monies owed an intended beneficiary under an alleged seaman's contract of employment.

3. This lawsuit is an admiralty claim and therefore not subject to the venue considerations set forth in 28 U.S.C. § 1391, et seq. Venue is proper in this district because activities and matters relating to the herein issues occurred in this district as is more fully detailed below.

## PARTIES

4. NILOUFER ANNA MARIA BRAGANZA ("Niloufer Braganza") is sui juris and, at all material times, was a permanent resident of Canada.

5. Niloufer Braganza is the widow of Renford Agnello Eustace Braganza ("RB") who was lost at sea on May 11, 2009 while serving aboard the motor tanker BRITISH UNITY (IMO No.: 9285732) in the capacity of Chief Engineer.

6. At all times material hereto, the deceased, RB, was acting within the course and scope of his employment in the capacity of a Chief Engineer aboard the motor tanker BRITISH UNITY.

7. The M/T BRITISH UNITY is an oil tanker of approximately 600 feet in length propelled by a single diesel engine and typically carrying crude oil products.

8. At all material times herein, the M/T BRITISH UNITY routinely and regularly called at ports located in the United States including ports located in New York. For instance, and without the benefit of discovery, customs records show that in 2009 alone,

2

the vessel was trading almost monthly back and forth between foreign ports and the United States carrying unleaded gasoline and Naphtha and making port calls in New York, New York; Newark, New Jersey; Brownsville, Texas; Savannah, Georgia; and/or Houston, Texas. In fact, for the period May, 2009 through July, 2009, the M/T BRITISH UNITY made three port calls in the New York, New York and New Jersey area.

9. Defendant EXECUTIVE SHIP MANAGEMENT PTE LTD. is a business entity organized and existing under the laws of a foreign jurisdiction.

10. At all material times hereto, defendant EXECUTIVE SHIP MANAGEMENT PTE LTD. personally or through an agent(s) engaged in substantial and not isolated activity with the State of New York and with the United States subjecting it to the jurisdiction of the courts of this State.

11. Among other things, defendant EXECUTIVE SHIP MANAGEMENT PTE LTD., at all times material hereto, personally or through an agent(s) engaged (and continues to engage) in the following based upon information and belief:

   a. Contracts on behalf of BP and/or acts on behalf of hundreds of foreign sailors who regularly and routinely call at ports of the United States including ports located in the State of New York.

   b. Applies for and obtains United States Visas on behalf of sailors and/or their families serving aboard vessels regularly and routinely calling in the United States.

   c. Coordinates/manages/and pays for the travel of sailors and/or their families into and out of the United States in connection with manning vessels regularly and routinely calling at ports in the United States.

3

    d. Markets, advertises and otherwise holds itself out as maintaining shipping operations in the United States.

    e. Voluntarily appears and defends claims in the United States on behalf of vessels with whom it provides services without reservation of any jurisdictional defenses. (*See, e.g.,* <u>Town of Gramercy v. Blue Water Shipping Services, et al.</u>, United States District Court, Eastern District of Louisiana, Civil Action Number 07-2655.)

    f. Maintains offices and places of business within the United States located in, upon information and belief, Sugarland, Texas and Phoenix, Arizona.

12. Defendant BP p.l.c. is a business entity organized and existing under the laws of the United Kingdom.

13. Defendant BP p.l.c. is the parent company of more than forty subsidiaries with operations throughout the world including subsidiaries located and doing business in the United States including within New York.

14. Upon information and belief, at all times material herein, defendant BP p.l.c. personally or through an agent(s) engaged in substantial and not isolated activity with the State of New York and with the United States subjecting it to the jurisdiction of this Court.

15. Upon information and belief, at all times material herein, defendant BP p.l.c. is subject to jurisdiction of this Court by reason of it having controlled, made financially dependent, participated in the selection of executive personnel, and influenced the marketing and operational policies of its subsidiaries doing business in the United States and in New York.

16. The "BP" website contains the following statement in connection with Virtue class tankers like the M/T BRITISH UNITY: "*The BP Virtue class tankers are double hull . . . . They are British-flagged, with Douglas, Isle of Man as their port of registry. Their classification society is Lloyds Register. <u>BP operates these ships, providing its own crew and provisions</u>. They operate worldwide.*" [Emphasis added.]

17. Defendant BP SHIPPING, LTD. is a business entity organized and existing under the laws of a foreign jurisdiction, but, upon information and belief, is doing business throughout the United States including in New York and New Jersey. BP SHIPPING, LTD. is a wholly owned subsidiary of BP p.l.c.

18. The Oil Pollution Act of 1990 and MARPOL 73/78 requires owners/operators of certain vessels to prepare and file a Vessel Reponse Plan ("VRP"). Defendant BP SHIPPING, LTD. is identified on the U.S. Coast Guard's vessel response website as the vessel's "owner" and "operator" and "plan holder." Similarly, defendant BP SHIPPING LTD. is identified on the www.bp.com website as being the "operator" of the M/T BRITISH UNITY.

19. Upon information and belief, defendant BP SHIPPING, LTD. has sought Vessel Resource Management approvals for all of its "British" stem-named vessels with an extensive history of exchanging correspondence with the U.S. Coast Guard dating back to 1993.

20. Defendant BP SHIPPING, LTD. contracted with O'Brien's Response Management, Inc. located in Plainsboro, New Jersey in connection with submitting the M/T BRITISH UNITY's VRP to the U.S. Coast Guard and, upon information and belief, has similarly contracted with other entities located in the United States.

5

21. Upon information and belief, defendant BP SHIPPING LTD. is identified as the operator of all of the "British" stem-named vessels which vessels makes regular and routine calls in the United States. For example, on or around April 14, 2010, the M/T BRITISH SECURITY was underway and making way in the Mississippi River; the M/T BRITISH ENSIGN was at anchor in New York, New York; the M/T BRITISH OAK was at anchor in Long Beach, California; and the M/T BRITISH SERENITY was underway in Narragansett Bay, Rhode Island. However, the sheer volume of port calls made in the United States by these "British" stem vessels does not stop there: the M/T BRITISH SECURITY was at Pascagoula, Mississippi on February 12, 2010, at Texas City, Texas on February 28, 2010, and at Jacksonville, Florida on April 14, 2010; the M/T BRITISH TENACITY was at Texas City, Texas on March 31, 2010; the M/T BRITISH COURTESY was at Galveston, Texas on January 23, 2010, Texas City, Texas on February 2, 2010, and at New York, New York and New Jersey on March 4, 2010; the M/T BRITISH EMISSARY was at Galveston, Texas on January 26, 2010 and at Mobile, Alabama on February 8, 2010; the M/T BRITISH LAUREL was at Port Angeles, Washington on February 8, 2010 and Long Beach, California on February 20, 2010; the M/T BRITISH OAK was at Long Beach, California on March 5, 2008 and again on March, 25, 2010; the M/T BRITISH OSPREY was at Texas City, Texas on March 2, 2010; the M/T BRITISH PIONEER was at Long Beach, California on February 8, 2010 and again on February 15, 2010; the M/T BRITISH PURPOSE was at Long Beach, California on February 27, 2010; and the M/T BRITISH ROBIN was at Jacksonville, Florida on April 3, 2010.

22. Upon information and belief, each of the Virtue Class vessels (like the M/T BRITISH UNITY) has at least twenty-five officers and crewmembers aboard meaning that

6

in just the early part of the year 2010, these "British" stem vessels were not only carrying millions of gallons of oil products in and out of the United States, but hundreds of crewmembers in and out of the United States.

23. This trading pattern and the regular and routine contacts with the United States have been ongoing for years. For instance, in 2009 the M/T BRITISH TRANQUILITY was at Jacksonville, Florida on January 24, 2009, Texas City, Texas on February 2, 2009, and New York, New York and New Jersey on March 18, 2009; the M/T BRITISH TRADER was at Freeport, Texas on June 26, 2009; the M/T BRITISH MERLIN was at Freeport, Texas on March 5, 2009, and Texas City, Texas on March 29, 2009; the M/T INTEGRITY was at Port Everglades, Florida on April 7, 2009 and Texas City, Texas on April 21, 2009; the M/T BRITISH HARMONY was at New York, New York and New Jersey on June 25, 2009; the M/T BRITISH COMORANT was at Freeport, Texas on April 29, 2009; and the M/T BRITISH CHIVALRY was at Tacoma, Washington on June 10, 2009; and the M/T BRITISH HARMONY was at New York, New York on June 25, 2009.

24. Contained in RB's effects is a document entitled "Sea Service Testimonial - Engineering Officer" with the "Company Address/Contract Details" solely identifying "BP Shipping Limited" with an address at Sunbury-on-Thames, Middlesex, United Kingdom.

25. Defendant BP MARITIME SERVICES (SINGAPORE) PTE LIMITED is a business entity organized and existing under the laws of a foreign jurisdiction, but, upon information and belief, is doing business throughout the United States including in New York.

7

26.     Defendant BP MARITIME SERVICES (ISLE OF MAN) PTE LTD. is a business entity organized and existing under the laws of a foreign jurisdiction, but, upon information and belief, is doing business throughout the United States including in New York.

27.     Defendant BP MARITIME SERVICES LTD. is a business entity organized and existing under the laws of a foreign jurisdiction, but, upon information and belief, is doing business throughout the United States including in New York.

28.     Defendant BP SHIPPING is a business entity organized and existing under the laws of a foreign jurisdiction, but, upon information and belief, is doing business throughout the United States including in New York.

29.     Defendant PIPTON, LTD. is a business entity organized and existing under the laws of a foreign jurisdiction with a place of business located in the same office as defendant BP SHIPPING, LTD. being Sunbury-on-Thames, United Kingdom.

30.     Upon information and belief, defendant PIPTON, LTD. is a shell corporation and/or a mere department of BP p.l.c. and/or its subsidiaries with its sole function being to hold legal title to the M/T BRITISH UNITY.

31.     Defendant PIPTON, LTD. is subject to the jurisdiction of the United States and this Court by reason of the regular and routine calls by the M/T BRITISH UNITY at ports in the United States including in New York, New York.  It is further subject to jurisdiction by reason of the dominion and control exercised over it by various defendants who do business in the United States.

32.     In the alternative, one or more of the defendants is subject to jurisdiction in the United States pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure.

33. In the alternative, the systematic and continuous contacts of vessels owned and/or chartered and/or managed and/or maintained and/or staffed and/or operated and/or otherwise controlled by defendants with the United States and the State of New York makes one or more of the defendants amendable to the jurisdiction of this Court.

34. Upon information and belief, and at all material times, defendants owned, chartered, managed, maintained, staffed, operated and/or otherwise controlled the M/T BRITISH UNITY.

35. Upon information and belief, and at all material times, defendants were the employers of the decedent, RB.

## FACTS COMMON TO ALL ALLEGATIONS

36. Plaintiffs re-adopt and re-allege all of the paragraphs above as fully set forth herein, and in addition allege upon information and belief the following:

37. At all times material hereto, RB was a crewmember aboard the M/T BRITISH UNITY and was acting within the course and scope of his duties as a seaman aboard the M/T BRITISH UNITY.

38. Beginning in approximately 2004, RB began sailing aboard BP vessels in the position of Chief Engineer.

39. On or about February, 2009, RB joined the M/T BRITISH UNITY.

40. At some point thereafter, the M/T BRITISH UNITY was underway on a voyage to the Port of New York, New York with RB aboard in the capacity of Chief Engineer.

41. RB was due to leave the M/T BRITISH UNITY when it reached the Port of New York, New York and to spend a period of vacation time ashore with his family.

42. RB was also anticipating seeing his sister, a United States citizen and resident of the State of New Jersey, upon departing the vessel in New York.

43. When the M/T BRITISH UNITY called at ports in New York and New Jersey, RB would invite family members living in the New York and New Jersey region to join him aboard the vessel and/or he would travel ashore to meet with his relatives.

44. At some point during the M/T BRITISH UNITY's voyage to the United States, RB disappeared and could not be found aboard the M/T BRITISH UNITY.

45. At some point in time following RB's disappearance and due to RB's disappearance, an emergency was declared by the M/T BRITISH UNITY.

46. Concurrent with declaring an emergency, the M/T BRITISH UNITY contacted the "BP NOTIFICATION CENTRE" at a telephone number located in the United States and bearing a "630" area code which is associated with BP's offices located in Chicago, Illinois.

47. Thereafter, the M/T BRITISH UNITY received an e-mail message from "BP QI-Capt. CRAIG W. LEE" regarding the vessel's emergency.

48. At all material times herein, Captain Craig W. Lee was the Port Superintendant for Defendant BP Shipping USA, Inc.

49. At all material times herein, and upon information and belief, the M/T BRITISH UNITY was taking direction from persons and entities located within the United States at the defendants' various American office locations.

50. On or about May 12, 2010, any search for RB was abandoned based on alleged likely survival times and the absence of having sighted any person in the open ocean.

51.     Thereafter, the M/T BRITISH UNITY continued its voyage and made its first port of call following RB's disappearance in New York arriving on or about May 18, 2009.

52.     Upon arriving in Staten Island, New York, and along with the M/T BRITISH UNITY's agent (Gac Shipping (USA), Inc. of Woodbridge, New Jersey), BP investigation teams, authorities from the Port Authority of New York and New Jersey, the U.S. Coast Guard and representatives of the vessel's flag state attended aboard the vessel in response to RB's disappearance.

53.     In addition, and upon learning of her husband's disappearance, Niloufer Braganza flew to New York, New York and met with the defendants' various representatives and agents.

54.     Defendant Executive Ship Management PTE Ltd. applied for the United States visa and reserved and purchased airline tickets allowing Niloufer Braganza to travel to New York, New York.

55.     Despite further searches aboard the M/T BRITISH UNITY while the vessel was in New York including, but not limited to, canine searches, RB was never found.

56.     In connection with RB's disappearance, the M/T BRITISH UNITY's Official Log was marked "LOST AT SEA BELIEVED KILLED OR DROWNED."

57.     There are no entries whatsoever in any log book associated with the M/T BRITISH UNITY concluding, stating or otherwise inferring that RB committed suicide.

58.     There is no documentation (including any electronic data compilation such as an e-mail) generated or received aboard the M/T BRITISH UNITY concluding, stating or otherwise inferring that RB committed suicide.

59.     There are no findings by any interested entity such as, but not limited to, the vessel's flag state, the Port Authority of New York and New Jersey, the U.S. Coast Guard, etc. concluding, stating or otherwise inferring that RB committed suicide.

60.     There are no crewmember statements concluding, stating or otherwise inferring that RB committed suicide.

61.     Thereafter, in a report on defendant BP SHIPPING LIMITED's letterhead dated September 28, 2009, BP SHIPPING LIMITED's "Senior Legal Adviser" concluded that the "likely scenario to be that the C/E jumped overboard intentionally and therefore took his own life."

62.     Although demanded, the Defendants thereafter failed and refused to pay any compensation to RB's widow and minor children based on their assertion of the terms and conditions of an alleged seaman's contract of employment with RB purportedly excepting such payments in the event of a suicide.

63.     The Defendants have since refused to provide requested documents and/or information.

64.     All conditions precedent to bringing this action have been met.

## FIRST CAUSE OF ACTION

(Claim for Proceeds of Death Benefit)

65.     Plaintiffs re-adopt and re-allege all of the paragraphs above as fully set forth herein, and in addition allege upon information and belief as follows:

66.     Defendants allege the existence of a seaman's contract of employment with RB for the subject voyage to New York on which RB disappeared and/or that RB was subject to the terms and conditions of such a seaman's contract of employment.

12

67. Defendants have failed to produce any such seaman's contract of employment and the same was not included in RB's personal effects delivered to Niloufer Braganza.

68. To the extent such an alleged seaman's contract of employment exists and is enforceable in whole or in part and/or RB is found to have been subject to the terms and conditions of such an alleged seaman's contract of employment, it requires payment to Niloufer Braganza as a designated beneficiary of a certain sum of money due to RB's death while serving aboard the M/T BRITISH UNITY.

69. To the extent such an alleged seaman's contract of employment exists and is enforceable in whole or in part and/or RB is found to have been subject to the terms and conditions of such an alleged seaman's contract of employment, defendants have failed and refused to make payment of the certain sum of money due and owing Niloufer Braganza under the alleged seaman's contract of employment on the sole basis that they contend RB committed suicide.

70. Defendants have not offered and cannot offer any proof whatsoever in support of such an assertion and their refusal to pay is without any legal or factual basis.

71. To the extent such an alleged seaman's contract of employment exists and is enforceable in whole or in part and/or RB is found to have been subject to the terms and conditions of such an alleged seaman's employment contract, defendants failure to pay Niloufer Braganza is a breach of contract for which she has standing to sue on by reason of her intended beneficiary status.

WHEREFORE, and without prejudice to any claim(s) to be asserted at a future date and without prejudice to any defense(s) that may be properly raised against any term(s) or condition(s) of any such alleged seaman's contract of employment, Plaintiff Niloufer

13

Braganza demands judgment against Defendants for any and all monies owed under any alleged seaman's contract of employment and/or by reason of RB being found to have been subject to the terms and conditions of any alleged seaman's contract of employment to the extent such contract exists and is enforceable and/or its terms and conditions are proven enforceable in whole or in part (in an amount to be determined at trial) along with pre-judgment interest as permitted, attorneys' fees as permitted, costs as permitted, trial by jury for all issues so triable, and any other further or different relief as this Court deems just and appropriate.

Dated: New York, NY
May 10, 2010

DeOrchis & Partners, LLP

By: _____
Vincent M. DeOrchis, Esq.
John K. Fulweiler, Esq.
61 Broadway, 19th Floor
New York, NY 10006
212-344-4700 - Telephone
212-422-5299 - Facsimile
vdeorchis@marinelex.com
jfulweiler@marinelex.com

-- Of Counsel --

Duval Vassiliades Solicitors
85 Gracechurch Street
London EC3V 0AA
UNITED KINGDOM
Attn.: Jonny Duval